# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-1550

ROSE DOVE EGLE

VERSUS

JOHN M. EGLE

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 980015
HONORABLE KRISTIAN EARLES, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses G. Thibodeaux, Chief Judge, Jimmie C. Peters, and Elizabeth A. Pickett, Judges.

**REVERSED AND RENDERED.**

**Walter C. Thompson, Jr.**
**Nicholas D. Doucet**
**Jan K. Frankowski**
**Barkley & Thompson, L.C.**
**Suite 2350, 1515 Poydras Street**
**New Orleans, LA 70112**
**(504) 595-3350**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
     **Rose Dove Egle, et al.**


**Bob F. Wright**
**James Parkerson Roy**
**Domengeaux, Wright, Roy & Edwards**
**556 Jefferson Street, Suite 500**
**Post Office Box 3668**
**Lafayette, LA 70502**
**(337) 233-3033**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
     **Rose Dove Egle, et al.**

**H. Alston Johnson, III**
**Thomas H. Kiggans**
**Michelle F. Plauché**
**Phelps Dunbar LLP**
**Suite 701, City Plaza**
**445 North Boulevard**
**Baton Rouge, LA  70802**
**(225) 346-0285**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Smith International, Inc.**

PETERS, J.

We revisit this case on appeal by Smith International, Inc. from a judgment on the merits rendered against it in connection with its purchase of a business owned in part by trusts set up for the benefit of the three children of John and Rose Egle. For the following reasons, we reverse the trial court judgment and render judgment in favor of Smith International, Inc., dismissing the plaintiffs' demands at their costs.

## DISCUSSION OF THE RECORD

This appeal represents at least the fourth time that an issue in these proceedings has been presented to this court for our review; our court has published three opinions regarding various aspects of the litigation. *See Egle v. Egle*, 00-1759 (La.App. 3 Cir. 6/6/01), 787 So.2d 567, *writ denied*, 01-2002 (La. 10/26/01), 799 So.2d 1155; *Egle v. Egle*, 01-927 (La.App. 3 Cir. 2/6/02), 817 So.2d 136; *Egle v. Egle*, 05-531 (La.App. 3 Cir. 2/8/06), 923 So.2d 780. Because these prior opinions include an exhaustive recitation of the complicated and lengthy factual and procedural history of this litigation, we reference them for a more complete history of the litigation and limit our recitation of the facts and procedural issues to the basics needed for an understanding of the matter now before us. Suffice it to say that this aspect of the litigation involves an attempt to recover, on behalf of the three previously mentioned trusts, a greater portion of the proceeds of the sale of Tri-Tech Fishing Services, L.L.C. (Tri-Tech), an oilfield service limited liability company, to Smith International, Inc. (Smith International).

This litigation began as a community property dispute between Mr. and Mrs. Egle, and this phase of the dispute has as its roots a business transaction which began to develop in March of 1993, or over one year before the Egle children's trusts were formed. At that time, Ray Daugherty and three other individuals formed Tri-State

Technologies, Inc. (Tri-State), an oilfield fishing and tool rental business. While Tri-State was successful, it initially suffered cash flow problems, and it was then that Mr. Egle, who was Mr. Daugherty's neighbor, became involved. After some initial negotiations, Mr. Egle and the owners of Tri-State, acting primarily through Mr. Daugherty, agreed to join Tri-State with a yet-to-be-formed limited liability company which would provide the needed operating capital for the business operation.

The final agreement provided for Tri-State and the contemplated limited liability company to form a third legal entity with both having an equal ownership interest in the new company. Additionally, the agreement provided that Mr. Daugherty would have a twenty-five percent interest in the limited liability company to be formed by Mr. Egle, and that Glenn Dauterive would have a twelve percent interest. Mr. Dauterive had no interest in Tri-State, but was at the time employed by a Houston, Texas company. Mr. Dauterive was offered an ownership interest by Mr. Egle and Mr. Daugherty because of his sales expertise.

To comply with his part of the merger agreement, Mr. Egle, together with his wife, formed three trusts for the benefit of their minor children, Michelle, John Jr., and Lauren. The Egles funded the three trusts with just under $1,000,000.00, divided equally among the three trusts. Of that total, $20,000.00 to each trust represented donations and the remainder represented loans to the trusts, evidenced by promissory notes to Mr. Egle.[1] As explained by Albert Ajubita, a New Orleans, Louisiana attorney specializing in trusts, estate planning, and tax related matters, who provided the legal services for the formation of the trusts, the $20,000.00 to each trust represented the maximum tax-free donation the Egles could give to their children

---

[1]Each trust received loans totaling $313,716.99 in four increments: $63,583.33 on April 20, 1994; $83,467.00 on May 27, 1994; $83,333.33 on June 20, 1995; and $83,333.33 on June 12, 1995.

within the time period when the trusts were formed. The trust documents appointed Mr. Egle's sister and brother, Janet E. Harrison and Don M. Egle, as co-trustees of each trust.

The three trusts came into existence on April 19, 1994, and on the next day, the co-trustees executed Articles of Organization for The Egle Group L.L.C. (The Egle Group), the limited liability company contemplated in the agreement with Tri-State. The Initial Report filed with the Louisiana Secretary of State identified Janet E. Harrison and Don M. Egle, in their capacity as co-trustees of the three trusts, as its initial managers. Mr. Ajubita provided legal services for the organization of this legal entity as well, and confirmed through his testimony that a primary purpose for forming The Egle Group was to make available a vehicle for Mr. Egle to use the trusts' money for investment purposes without sustaining individual tax liability. Specifically, while the trusts would own The Egle Group, Mr. Egle was to make the investment decisions.[2]

On the same day it was created, subscription agreements were executed wherein each trust acquired an ownership interest in The Egle Group. Pursuant to these subscription agreements, John Jr.'s trust received a 29.34 percent interest in exchange for the payment of $44,010.00, and the other two trusts received a 29.33 percent interest each in exchange for individual payments of $43,995.00. Prior to that time, on April 14, 1994, the co-trustees had executed a subscription agreement on behalf of The Egle Group wherein it transferred to Mr. Dauterive a twelve percent interest in the yet-to-be-formed limited liability company in exchange for a purchase price of $18,000.00. The subscription agreement described The Egle Group as a

---

[2]The co-trustees acknowledged that they abandoned any authority they may have had in regard to investment decisions to their brother.

3

limited liability company already in existence and further stated that Mr. Dauterive

paid the purchase price "simultaneously with the execution of [the] agreement."

On October 1, 1994, the co-trustees and Mr. Dauterive executed The Egle

Group's operating agreement. With regard to ownership, Section 1.1 of the Operating

Agreement reads as follows:

> Don M. Egle and Janet E. Harrison, as Trustees for The Egle Trust for
> Michelle A. Egle, The Egle Trust for John M. Egle, Jr., and the Egle
> Trust for Lauren E. Egle (the "Organizers"), have acted as organizers to
> form a Louisiana limited liability company under the laws of the State
> of Louisiana by the filing of Article of Organization (the "Articles") for
> The Egle Group, L.L.C. (the "Company"), pursuant to the Louisiana
> Limited Liability Company Law, La. R.S. 12:1301 et seq., on behalf of
> The Egle Trust for Michelle A. Egle, The Egle Trust for John M. Egle,
> Jr., The Egle Trust for Lauren E. Egle, Glen [sic] Dauterive, and any and
> all additional and/or substituted Members under Sections 2.8 and 6.4
> hereof (hereinafter referred to collectively as the "Members").

An exhibit attached to the Operating Agreement listed the percentage of ownership

and the initial capital paid by each member to be as follows:  The Egle Trust for

Michelle A. Egle - 29.33 percent with a cash capital contribution of $43,995.00; The

Egle Trust for John M. Egle, Jr. - 29.34 percent with a cash capital contribution of

$44,010.00; The Egle Trust for Lauren E. Egle - 29.33 percent with a cash capital

contribution of $43,995.00; and Glenn Dauterive - twelve percent with a cash capital

contribution of $18,000.00.

Mr. Daugherty's ownership interest in The Egle Group is evidenced by three

subscription agreements, dated October 6, 1994, wherein the three trusts transferred

to him a total ownership interest of twenty-five percent for the total purchase price

of $37,500.00.[3]   The subscription documents state that Mr. Daugherty made the

---

[3]The trusts for Michell and Lauren transferred an 8.33 percent interest while John Jr.'s trust transferred an 8.34 percent interest.

appropriate payments to each trust contemporaneously with the execution of the agreements.

Thus, on October 6, 1994, the records of The Egle Group indicated that the agreement reached by Mr. Egle, Mr. Daugherty, and Mr. Dauterive concerning ownership of The Egle Group had been completely consummated. That is to say, Mr. Dauterive owned a twelve percent interest and Mr. Daugherty owned a twenty-five percent interest in the limited liability company. Based on the stated capital contributions, each entity owning an interest in The Egle Group had paid $1,500.00 per percentage point of ownership interest.

The formation of the third business entity, as contemplated by the initial agreement, occurred even before the agreed-upon ownership of The Egle Group was documented. On June 1, 1994, The Egle Group and Tri-State, as equal co-owners, formed Tri-Tech. As previously contemplated, the funds assuring the operation of Tri-Tech came about in the form of loans from the three trusts.

Through the financial backing of the three trusts and the operation and sales skills of Mr. Daugherty and Mr. Dauterive, Tri-Tech became an extremely successful business. So successful that on April 16, 1997, or less than three years after its creation, Smith International purchased Tri-Tech from The Egle Group and Tri-State for $20,000,000.00. The proceeds of the sale were placed in an escrow account and ultimately disbursed pursuant to a written agreement submitted to the escrow agent by Tri-State, The Egle Group, Tri-Tech, and the three trusts. The net proceeds due The Egle Group were divided among the then record owners as follows: the three trusts - sixty-three percent, or twenty-one percent each; Mr. Daugherty - twenty-five percent; and Mr. Dauterive - twelve percent. After settlement expenses were

5

deducted, the three trusts received $5,874,486.81 ($1,958,162.27 for each trust), Mr. Daugherty received $2,273,240.30, and Mr. Dauterive received $1,096,163.55 as their shares of the net proceeds of the sale. Additionally, each trust received $187,713.33 from settlement expenses as repayment of the funds borrowed by The Egle Group to fund Tri-Tech operations.

After the trusts had received the proceeds of the sale, and after all relationships associated with the Tri-Tech venture had been severed, Mr. Egle borrowed from the children's trusts, made some new and obviously poor financial decisions using the borrowed funds, and ultimately declared personal bankruptcy. He was unable to repay the children's trusts any significant amount through the bankruptcy proceedings. According to Don M. Egle,[4] when Mr. Egle declared bankruptcy, he still owed each of the trusts approximately $800,000.00. When the original co-trustees were replaced, each trust had a balance of approximately $167,333.33.

During the initial phases of the community property litigation, Mrs. Egle began to gather evidence concerning Mr. Egle's misappropriation and/or misuse of the children's trust funds. She filed suit individually and as tutrix of the minor children in an effort to recoup some of the loss occasioned by Mr. Egle's activities. The defendants in the suit ultimately included Mr. Egle, the original co-trustees, The Egle Group, Tri-State, Tri-Tech, Mr. Dauterive, Mr. Daugherty, and Smith International. During the course of the litigation, the original co-trustees were replaced and the newly appointed trustee intervened in the litigation, joining forces with Mrs. Egle. When Michelle and John Jr. reached the age of majority, they were substituted as parties plaintiff (hereinafter Mrs. Egle, the trustee, Michelle, and John Jr. will be

---

[4]Don M. Egle was still co-trustee at the time of the bankruptcy filing.

collectively referred to as the plaintiffs). When this matter finally went to trial, Smith International was the only remaining defendant.

At the trial on the merits, the plaintiffs did not contest the validity of the sale of Tri-Tech to Smith International or the sufficiency of the purchase price. Instead, they argued that the ownership interests of Mr. Daugherty and Mr. Dauterive in The Egle Group arose from fraudulent acts, that Tri-Tech should have paid the proceeds from the sale to Smith International represented by those ownership interests to the children's trusts, and that Smith International is responsible for the acts or omissions of Tri-Tech.

After completion of the evidence, a jury returned a verdict wherein it determined that (1) the sales of the interests in The Egle Group to Mr. Daugherty and Mr. Dauterive were not valid, (2) Tri-Tech misappropriated or conspired in the misappropriation of the interests in The Egle Group when portions of the proceeds of the sale of Tri-Tech were paid to Mr. Daugherty and Mr. Dauterive instead of the trusts, (3) Tri-Tech committed or conspired to commit fraud when the proceeds of the sale of Tri-Tech were paid to Mr. Daugherty and Mr. Dauterive instead of the trusts, (4) Smith International was the successor to Tri-Tech, and (5) Smith International did not act in good faith in purchasing Tri-Tech.

On June 1, 2004, the trial court executed a written judgment in accordance with the jury's verdict. In doing so, it rendered judgment in favor of the plaintiffs, and against Smith International, in the amount of $3,468,919.29. Thereafter, on June 15, 2004, Smith International filed a motion seeking a judgment notwithstanding the jury's verdict (JNOV), a remittitur, or a new trial. Based on the subsequent action of the trial court with regard to those motions, Smith International then appealed the

7

June 1, 2004 judgment, and the plaintiffs answered the appeal. This court dismissed the appeal for lack of jurisdiction by an opinion rendered February 8, 2006. *Egle,* 923 So.2d 780. The trial court then denied Smith International's pending motions, and Smith International again appealed. This appeal is now properly before us.

**OPINION**

In its four assignments of error, Smith International asserts that the trial court erred in denying its motion for JNOV because (1) the jury erred in concluding that the sales of the interests to Mr. Daugherty and Mr. Dauterive were invalid because they purchased their interests in The Egle Group through credit transactions rather than cash, (2) the trial court erred in concluding that Smith International was liable for the conduct of Tri-Tech, (3) the trial court erred in concluding that Mrs. Egle's release of the other defendants did not entitle Smith International to a full release, and (4) the trial court erred in denying Smith International's request that all of the defendants be included on the jury verdict form for the purpose of allocation of fault. The plaintiffs have answered the appeal, requesting an increase in the amount of judicial interest awarded. Because we find merit in Smith International's first assignment of error, we pretermit addressing Smith International's remaining assignments of error as well as the plaintiffs' answer to the appeal, as the issues presented therein are rendered moot by our decision.

***Standard of Review***

The supreme court, in *Joseph v. Broussard Rice Mill, Inc.*, 00-628, p. 4-5, (La. 10/30/00), 772 So.2d 94, 99, recently reasserted the criteria to be used in evaluating the granting or rejection of a JNOV.

> LA.CODE CIV. PROC. art. 1811 controls the use of JNOV. Although the article does not specify the grounds on which a trial judge

8

may grant a JNOV, in *Scott v. Hospital Serv. Dist. No. 1*, 496 So.2d 270 (La.1986), we set forth the criteria used in determining when a JNOV is proper. As enunciated in *Scott*, a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable persons in the exercise of impartial judgment might reach different conclusions. *Scott,* 496 So.2d at 274. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829, 832 (La.1991). This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact." *Scott*, 496 So.2d at 273; *Jinks v. Wright*, 520 So.2d 792, 794 (La.App. 3 Cir. 1987).

In reviewing a trial court's decision on whether or not to grant a JNOV, the appellate court must determine if the trial court erred in granting or denying the JNOV "by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict?" *Id.* If the answer to that question is in the affirmative, then the motion should have been granted. If not, it should be rejected. *Id.*

### Analysis of Transactions Involving Mr. Dauterive and Mr. Daugherty

The record before us establishes without question that, despite the language of the subscription agreements, neither Mr. Dauterive nor Mr. Daugherty paid the stated purchase price contemporaneously with their execution. The plaintiffs argued at trial, and on appeal, that this failure on the part of Mr. Dauterive and Mr. Daugherty rendered the transfers invalid. Thus, they argue, the net thirty-seven percent profit paid to the two men should have been paid to the three trusts. The jury obviously

9

agreed with this argument, and, in considering the JNOV, the trial court declined to disturb the jury's decision. In its first assignment of error, Smith International asserts that the jury's finding in this respect, as well as the trial court's denial of the JNOV, was error. We find merit in this assignment of error.

*Applicable Law*

"Contracts have the effect of law for the parties . . . ." La.Civ.Code art. 1983. The subscription agreements at issue in this phase of the litigation specifically provide for simultaneous payment of the purchase price by both Mr. Dauterive and Mr. Daugherty, which did not occur. But "[a]n obligation may be valid even though its cause is not expressed." La.Civ.Code art. 1969. Moreover, "[w]hen the expression of a cause in a contractual obligation is untrue, the obligation is still effective if a valid cause can be shown." La.Civ.Code art. 1970. *See Coffee Bay Investors, L.L.C. v. W.O.G.C. Co.*, 03-406 (La.App. 1 Cir. 4/2/04), 878 So.2d 665, *writ denied*, 04-1084 (La. 6/25/04), 876 So.2d 838. While the subscription agreements expressed the cause as being cash exchanged at the time of the transfer, the obligations were nevertheless effective if there was valid consideration given. As stated in La.R.S. 12:1321, "[t]he contribution of a member to a limited liability company may take the form of cash, property, services rendered, or a promissory note or other binding obligation to contribute cash or property or to perform services."

*Dauterive Transaction*

The April 14, 1994 subscription agreement between The Egle Group and Mr. Dauterive provides in part as follows:

> The Egle Group, L.L.C. offers and Glen [sic] Dauterive accepts, acquires and subscribes to a twelve (12%) percent interest in The Egle Group, L.L.C. for a total price of $18,000, and in payment thereof, Glen

[sic] Dauterive agrees to pay The Egle Group, L.L.C. said subscription price, in full, simultaneously with the execution of this agreement.

While Mr. Dauterive did not directly pay $18,000.00 to The Egle Group on April 14, 1994, it is not correct that Mr. Dauterive did not pay for his interest, or that the trusts never received credit for his payment.

The day he executed the subscription agreement, Mr. Dauterive also executed a promissory note in the amount of $18,000.00, made payable to Mr. Egle. Mr. Dauterive did not receive cash from Mr. Egle for this note. Rather, the three trusts each received a credit on the amount that they owed Mr. Egle. In fact, it would have been impossible for Mr. Dauterive to comply with the subscription agreement by paying The Egle Group, because it did not yet exist as a legal entity. Instead, he made arrangements for his interest to be paid for through a credit transaction with the one person everyone agrees was the one most responsible for the financial arrangements of The Egle Group.

The credit transaction is further evidenced by the ledger entries prepared by the trusts' accountants in May of 1995. These ledger entries establish that on April 7, 1994 each trust owed $147,000.00 to John Egle, and that each trust's debt was reduced by $6,000.00 on April 14, 1994 because Mr. Dauterive had assumed that portion of the trusts' debts to Mr. Egle. Additionally, the ledger entries reflect that on April 19, 1994, an initial deposit of $150,249.00 was made to The Egle Group from the three trusts. This initial deposit was the capital contribution for the three trusts and Mr. Dauterive. Finally, the escrow disbursement records of the proceeds of the sale to Smith International reflect that Mr. Dauterive's share was reduced by $22,157.74. That amount was in turn paid to Mr. Egle as payment in full of the balance due on the $18,000.00 promissory note.

***Daugherty Transaction***

The October 6, 1994 subscription agreements between the trusts and Mr. Daugherty provided in part as follows for each trust:

> Daugherty by these presents hereby purchases and Trust hereby sells its interest in and to an 8.33% interest in The Egle Group, L.L.C. for the sum of Twelve Thousand Five Hundred ($12,500) Dollars. Trust hereby acknowledges receipt of cash in the amount of $12,500, and grants full acquittance and discharge therefor.[5]

On that same day the four existing members of The Egle Group, Mr. Dauterive and the three trusts, executed a "unanimous consent of members" approving of the sale, pursuant to La.R.S. 12:1332(A)(1).[6]

With regard to the purported $37,500.00 cash payment, Mr. Daugherty testified that on October 6, 1994, he also executed a $37,500.00 promissory note made payable to Mr. Egle. According to Mr. Daugherty, Mr. Egle agreed to loan him the money needed to purchase the ownership interest. Although he received no money from Mr. Egle on that day to pay the trusts, the aforementioned ledger entries reflect that trusts each received a credit of $12,500.00 on the amount each owed Mr. Egle. Mr. Egle executed a partial release for each of the trusts on October 6, 1994, recognizing that each trust had made a payment of $12,500.00 on the April 20, 1994 loans of $63,583.33 to each trust. The disbursement agreement for the initial installment of the proceeds from the sale of Tri-State to Smith International shows that Mr. Daugherty's share of the proceeds from the Egle Group - $1,618,828.12 - was

---

[5]The subscription agreement involving the trust for John Jr. provided for the sale of an 8.34% interest.

[6]La.R.S. 12:1332(A)(1) provides:
An assignee of an interest in a limited liability company shall not become a member or participate in the management of the limited liability company unless the other members unanimously consent in writing.

12

reduced by $46,166.95 to discharge his obligations under the $37,500.00 note to Mr. Egle.

Part of the problem with Mr. Daugherty's acquisition is that on April 21, 1995, or six months after the original transactions involving his ownership acquisition, Mr. Daugherty received a $37,500.00 check from Mr. Egle with instructions for him to write checks to each of the trusts for $12,500.00. After Mr. Daugherty had complied with Mr. Egle's instructions and transferred the money to the three trusts, the trusts then transferred the money back to Mr. Egle. According to Mr. Daugherty, Mr. Egle told him the transaction was necessary to document the original transaction wherein he acquired his ownership interest. However, Bert Verdigets, a certified public accountant and certified fraud examiner who testified for the plaintiffs, said that "[i]t was money that went from the trusts, to Mr. Egle; to Mr. Daugherty, back to the trusts, and then Mr. Egle got the money." Mr. Verdigets saw the transaction as a highly suspicious "round robin" transaction with Mr. Egle being the recipient of funds which should have remained in the trusts.

While the second transaction was at best unorthodox, it had no effect on the final financial result. Simply stated, the trusts had previously been given credit for Mr. Daugherty's payment by Mr. Egle's partial forgiveness of the debt owed him by the trusts. The record does not reflect whether Mr. Egle credited the second transaction as a payment against what the trusts owed him or characterized it in another way. In any event, once he made the three payments to the trusts pursuant to Mr. Egle's instructions, Mr. Daugherty had no control over the actions of the trusts in again transferring the funds back to Mr. Egle.

13

***Summary***

The plaintiffs' primary argument with regard to the validity of the transfers to Mr. Dauterive and Mr. Daugherty rests upon the fact that they acquired their ownership interests by credit transactions with Mr. Egle wherein he gave the trusts credit for amounts owned him in exchange for promissory notes from the two men—despite the clear language of the subscription agreements to the effect that the two men paid cash for their interests. We find that this discrepancy in the language of the subscription agreements did not affect the validity of the subscription agreements.

The agreement giving rise to the Tri-Tech venture clearly included the understanding that both Mr. Dauterive and Mr. Daugherty would have an ownership interest in what was ultimately to become The Egle Group. Both Mr. Daugherty and Mr. Dauterive testified that they would not have entered into the Tri-Tech venture without receiving an ownership interest in The Egle Group. According to Mr. Dauterive, when recruited by Mr. Egle and Mr. Daugherty, he was servicing over 160 accounts for his former employer and brought two-thirds of those customers with him to Tri-Tech. Without an ownership interest in The Egle Group, Mr. Dauterive would not have left his Houston, Texas employment. Similarly, Mr. Daugherty testified that Mr. Egle had to increase his offer of ownership in Tri-Tech from twelve and one-half percent to twenty-five percent because he was having second thoughts about pursuing the joint venture if his ownership share was limited to the smaller figure.

The record is clear that, while expecting to participate in the ownership of The Egle Group, neither Mr. Dauterive nor Mr. Daugherty had excess funds to invest. In fact, the very purpose of The Egle Group was to make operating funds available to

ensure the success of the business. All five of the members of The Egle Group—Mr. Dauterive, Mr. Daugherty, and the three trusts—paid for their interests in the Egle Group with money loaned by Mr. Egle. All five members gave Mr. Egle promissory notes to evidence the loans, and all of the loans associated with the joint venture were recognized and extinguished through the final disbursement process.

When the trusts formed The Egle Group, they obviously knew about, and approved of, the participation of Mr. Dauterive and Mr. Daugherty in that limited liability company—and each co-owner paid exactly the same amount per ownership unit. For their investment of $132,000.00, the trusts received a net profit of $6,437,626.80 in less than three years. This windfall came about primarily through the sales and operations expertise of Mr. Dauterive and Mr. Daugherty.

Certainly better use of language and better timing of the activities associated with the initial formation of The Egle Group could have precluded this conflict. However, the record contains no evidence of fraudulent conduct of any person with regard to the organization, management, operation, or sale of Tri-Tech.[7] While Mr. Dauterive and Mr. Daugherty did not pay cash for their acquired interests in The Egle Group, they did give valid consideration for their interests. *Coffee Bay Investors, Inc.*, 878 So.2d 665. The facts and inferences point so strongly and overwhelmingly in favor of Smith International with regard to this issue that reasonable persons could not arrive at a contrary verdict. *Joseph*, 772 So.2d 94. That being the case, the jury erred in declaring the sales to Mr. Dauterive and Mr. Daugherty to be invalid and the trial court erred in not granting the JNOV.

---

[7]Mr. Egle's actions after the fact with regard to misappropriation and/or misuse of trust funds is not relevant to the issue before us as there is no evidence that any person or entity associated with the Tri-Tech venture played a part in that activity.

15

## DISPOSITION

For the foregoing reasons, we reverse the trial court judgment in favor of the plaintiffs and against Smith International, Inc. and render judgment in favor of Smith International, Inc., dismissing the plaintiffs' demands at their costs.

**REVERSED AND RENDERED.**